582 A.2d 359

**David K. LONG and Dixie M. Long, Appellants,**

**v.**

**Craig BROWN and Rebecca Brown.**

Superior Court of Pennsylvania.

Submitted April 30, 1990.

Filed Sept. 26, 1990.

Reargument Denied Nov. 19, 1990.

Karen L. Steele, Altoona, for appellants.

Clyde O. Black, II, Hollidaysburg, for appellees.

Before ROWLEY, TAMILIA, and BROSKY, JJ.

BROSKY, Judge.

This is an appeal from a final decree in an equitable proceeding to quiet title or compel specific performance of an alleged contract to sell real estate.

Appellants raise several issues, among them is whether a deed, signed by the purported grantors to be charged, but not legally delivered to the grantees, can be used in satisfaction of the Statute of Frauds. Implicit in this issue is an assertion that the court erred in finding that the Statute of Frauds was not satisfied by the documents offered by appellants in satisfaction of the statute. Because we believe the Statute of Frauds was satisfied in the present case, and because we also find that a contract for the sale of land was consummated, we reverse the decree.

Appellants and appellees are distantly related through marriage. Appellants had been attempting to sell their home for several years and were finally successful in that

endeavor. Upon selling their property they began searching for a lot in the Morrison Cove area in Blair County upon which they could build a new home. Having little luck they called appellees upon the suggestion of their uncle, who was also appellees' uncle. Appellees' owned a "double lot" of approximately two acres in size and indicated to appellants that they might be willing to sell some land to appellants. A meeting at appellees land was set up at which time Mr. Brown and Mr. Long walked the property and discussed the possibility of a sale.

The testimony varied to some degree as to what occurred subsequently. Mr. Long indicated that Mr. Brown agreed on the day of the meeting to sell approximately one acre to appellants. Mr. Brown indicated that he made no firm commitment to sell on that day. In any event, certain steps were carried out consistent with an impending sale of the property, all with apparent approval of appellees. A survey was conducted to set the exact lines of the parcel of land in question, a title search was conducted and a deed was prepared. Additionally, as there was a restriction in the deed preventing subdivision of lots, a release of restrictions was prepared which, if agreed to by all property owners in the subdivision, would allow the sale to take place. All the necessary signatures were obtained, including those of the appellees. However, also during this period of time, Mr. Brown asked Mr. Long to look at some other land in the area as a possible alternative to the Brown's lot. Mr. Long agreed to look at the land, but having done so, indicated he wanted to proceed with the sale of the Brown property. Mr. Brown, at some point during the negotiation, also indicated that there would be restrictions applicable to the sale. They were discussed in general and Mr. Brown was told to write them down at which time they would be given to the lawyer for inclusion in the deed.

Pursuant to these discussions, Mr. Brown prepared a written document entitled "Restrictive Agreement" which was signed by himself and which set forth ten separate provisions. Although there was some expressed reserva-

tion about one provision restricting the use of a public road, there was a general agreement to the provisions. However, another provision was reworded as it prevented the erection of buildings north of a power line. Mr. Long preferred reference to a fixed point rather than a movable one, consequently it was reworded to restrict buildings within one hundred feet of the Browns' southern boundary line. At about the same time Mr. Long told Mr. Brown that a deed had been prepared and asked that he and his wife go to his lawyer's office to sign the deed so that they could proceed to get a mortgage. Mr. Brown went by himself to the lawyer's office and signed the deed but found it lacking the restrictions he had prepared. He took the deed home for reading and had it returned with his wife along with the written restrictions. Mr. and Mrs. Brown's understanding was that the restrictions would then be added to the deed. Mrs. Brown then signed the deed in the presence of the secretary after which the Browns left for vacation. Upon returning from vacation they saw that the lot had been cleared and that stakes had been set for the building of the house. Mr. Brown was, by his testimony, shaken upon seeing that the house was being positioned more towards the center of the lot than he had anticipated. He called Mr. Long and was told that the positioning of the house was being dictated by the septic field and, after some conversation, Mr. Brown agreed to eliminate the restriction as to the public road and to change the restriction on the buildings from 100 feet to 95 feet. A couple of days later Mr. Long was down on the property measuring distances at which time Mr. Brown went down to assist him. When the measurement of the one stake (indicating the corner of the home to be built) came out to 94 feet, Mr. Long asked Mr. Brown if they would modify the restriction to 94 feet. Mr. Brown then stated no they would not change the restriction and that they had changed their minds about selling the property and that they no longer thought it was a good idea.

Eventually the present suit was filed by the appellants seeking to quiet title to the property or, alternatively, a specific performance of the agreement. The trial court found that there had been no delivery of the deed thus, quiet title was an unavailable remedy. The court also found insufficient documentation of the alleged agreement to satisfy the Statute of Frauds. Thus, the court denied specific performance as well. The court did, however, award damages to appellants for out of pocket costs based upon justifiable reliance.

Turning to the trial court's decision, an integral part of the reasoning behind the decision below was the conclusion that the Statute of Frauds was not satisfactorily overcome after it was affirmatively raised by appellees. The Statute of Frauds instructs that a purported transfer of an ownership interest in real property is not enforceable unless evidenced in writing and signed by the party(ies) granting the interest. See, 33 P.S. § 1. It has been established that the writing(s) offered must set forth the essential terms of the contract, and that one or more writings can be utilized as long as all are signed or annexed to a signed writing. See, *Hessenthaler v. Farzin*, 388 Pa.Super. 37, 564 A.2d 990 (1989).

In all, three documents were offered by appellants in an effort to overcome the Statute of Frauds. One document was the release of restrictions which was signed by all homeowners in the sub-division, including appellees. This document states in relevant part: "Whereas, Craig Brown and Rebecca Brown are the owner of Lot No. 8 containing 2.00 acres, and are desirous of conveying a portion thereof, containing 1.002 acres to David K. Long and Dixie M. Long, ..." Another document offered was the "Restrictive Agreement" which was prepared by Mr. Brown and states: "The following restrictions agreed to on July 31, 1987, between David Long and Craig Brown, are binding on David Long and any subsequent owner of the property being sold. This property is one acre of land comprising the southern half of parcel # 8 (T-8) of Fox Hill estates, ..."

This document was likewise signed by Mr. Brown under the heading "Seller." The final document offered was the deed itself, which was also signed by the Browns. The deed, as one would expect, purported to transfer ownership of the property to the appellants for the sum of $12,024. As indicated earlier, the deed was signed by both of the appellees. However, there is a legitimate dispute as to whether or not there was a "delivery" of the deed to the appellants.

As the deed signed by appellees did not contain the restrictions which were undisputably part of the bargaining process, appellants argued that the deed was not delivered because there was no intention of delivery by the signing of that version of the deed. Appellants argue, however, that the deed was conditionally delivered. The condition being that there was subsequent agreement to, and inclusion of, the restrictions left with the attorney. Since there was a subsequent agreement on the restrictions, they argue, delivery was completed at that time. This point became rather important in the development of the case because the trial court concluded that a signed but undelivered deed could not be used in satisfaction of the Statute of Frauds. However, our own review of the law finds this position unsupported in law.

In reaching its conclusion, it is notable that the trial court did not find a case indicating that an undelivered deed cannot be used in satisfaction of the Statute of Frauds. In fact, the trial court distinguished a Pennsylvania Supreme Court case which seemed to support appellants' theory. In *Keil v. Good,* 467 Pa. 317, 356 A.2d 768 (1976), our Supreme Court reviewed a trial court's decision granting a motion for judgment on the pleadings based upon the affirmative defense of the Statute of Frauds. The appellants there asserted in a specific performance action that there existed an executed deed to the land in question. In vacating the order the court stated:

... plaintiffs allege the existence of a writing which, if its existence is proven, would remove the bar of the Statute of Frauds. In paragraph 8, plaintiffs allege that defen-

dants had executed a deed to the property at issue. In their answer defendants deny the execution of such a deed. Thus, the pleadings framed a factual issue which, depending on whether plaintiffs' allegations or defendants' allegations were ultimately proven, might have removed the Statute of Frauds....

356 A.2d at 771.

█ In its interpretation of this case, the trial court focused on the last phrase of the quote above, particularly the word "might" and concluded that "more evidence than the executed deed was required." (Trial Ct.Op. at 12) However, such a reading is completely too isolated, the phrase is prefaced with the comment "depending on whether the plaintiffs' allegations or the defendants' allegations were ultimately proven." When read together it is clear that the qualifying word "might" relates only to proof of the allegation, it does not indicate that more is necessary to remove the Statute. As such, we must disagree with the trial court's reading of the above precedent. Furthermore, there is nothing in the general law of the writing requirement to support this reading. In *Hessenthaler v. Farzin,* 388 Pa.Super. 37, 564 A.2d 990, 992 (1989), we stated:

[t]he purpose of the Statute is to prevent the possibility of enforcing unfounded, fraudulent claims by requiring that contracts pertaining to interests in real estate be supported by written evidence signed by the party creating the interest.... Pennsylvania courts have emphasized that the Statute is *not* designed to prevent the performance or enforcement of oral contracts that in fact *were* made.

(citations omitted, emphasis in original). In *Beeruk Estate,* 429 Pa. 415, 241 A.2d 755 (1968), our Supreme Court said, in reference to the Statute, "we should always be satisfied with 'some note or memorandum' that is adequate ... to convince the court that there is no serious possibility of consummating fraud by enforcement." Certainly a deed satisfies all of these policy considerations. As there is a lack of law or logic to support the trial court's position, we

must conclude that a deed signed but not legally delivered can be used to satisfy the Statute of Frauds.[1]

■ When the deed is considered along with the other written documents, the Statute must be deemed satisfied. There is ample documentation indicating a desire to transfer the property in question, the property is adequately described and the consideration is stated. Thus, all the requisite factors for removal of the Statute are present. However, the trial court is correct to the extent that it asserts that more may be necessary to prove the existence of an agreement. It is possible, as implied by the trial court, that a deed may be executed without the requisite intent to transfer, or with a conditional intent. This is, perhaps, one reason why delivery of the deed is considered essential to a transfer of title since it conveys objective intent to transfer.

■ We are concerned here, at least with respect to this issue, only with the applicability or non-applicability of the Statute of Frauds. The mere removal of the Statute does not necessarily compel a finding that a contract was entered into, or that an agreement reached is absolutely valid. These issues rely upon other areas of contract law. However, the removal of the Statute of Frauds *allows* the court to conclude that an agreement was entered into as well as enforce it, a conclusion which, under the Statute, cannot be reached until a signed writing is produced. Of course, the signed writing is itself rather substantive evidence tending to prove an agreement to sell and should be given due consideration. Which takes us to the next relevant inquiry, whether or not there existed a contract for the sale of the land in question.

1. It would seem rather incongruous to allow virtually any other type of writing to satisfy the Statute yet not allow a signed deed. A deed is a rather formal writing and is widely known to have legal significance. Thus, it would seem to support the reasoning behind the statute, which is the prevention of fraud. We would think that virtually no one would frivolously sign a deed purporting to transfer their land. Furthermore, a deed is more likely to include the relevant information in its final negotiated state.

■ As indicated earlier, appellants offered three separate documents, which when considered together and also in conjunction with the oral testimony, leads us to conclude that a contract for the sale of the property was reached. When the whole of the testimony is assimilated the reasonable interpretation of the events indicates that appellees assented to the appellants' efforts to purchase a tract of their land. Although appellees indicated that they maintained some reservations about consummating the deal, they in fact, made an objective manifestation of assent to the sale of their property. Under contract law the objective manifestation is the governing factor, regardless of subjective beliefs and reservations. In *Ingrassia Construction Co. v. Walsh*, 337 Pa.Super. 58, 486 A.2d 478, 482–483 (1984), we stated:

> A true and actual meeting of the minds is not necessary to form a contract.... In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter.... In the instant case, it matters not whether Walsh truly believed a contract did not exist *if* his manifested intent reasonably suggested the contrary to Ingrassia. Furthermore, a contract could be formed even if Walsh did not contemplate that legal consequences would attach to the transaction.

Upon review of the record, the applicability of these excerpts are apparent. First, appellees signed a document, the release of restrictions, that states they are desirous of conveying the parcel in question. Secondly, Mr. Brown prepared a document setting forth several restrictions on the property or connected promises and signed under the heading "seller." Thirdly, appellees acquiesced in the appellants' efforts to have the land surveyed and Mr. Brown, in fact, helped Mr. Long and the surveyor conduct the survey. (N.T. 220) They further acquiesced through the preparation of a deed and as the land was graded in

preparation of building. Appellees also signed the deed prepared by appellants' attorney.

Appellees' testimony also supports appellants' theory. Mr. Brown testified that after telling Mr. Long that there was a possibility of a steel company moving in nearby that he expected the Longs to decline a purchase. However, "[h]e surprised me in the fact that he said we're still interested and still want the land. At that time I felt somewhat pressured into the situation and told him that I would go ahead a (sic) sell him the property...." (N.T. 219). Mr. Brown also testified to telling Mr. Long that he would go with him to the neighbors' houses and assist him in obtaining the signatures for the "Release of Restrictions." (N.T. 225). Mr. Long further testified that after the release had been signed and when he was urging Mrs. Long to go and sign the prepared deed he told her that the deal hadn't been finalized because the restrictions hadn't been agreed to. He also testified that he told his wife that they were signing the deed conditional upon all the restrictions being agreed to by the Longs. (N.T. 236).

The objective manifestation of appellees' actions and words supports the conclusion that they had, indeed, assented to the sale of the property.[2] All of the signed documents convey that intent, and Mr. Brown admits as much, although he indicated that he maintained reservations about selling. The most favorable construction to appellees suggests that they expressed only conditional assent. However, the conditions expressed by Mr. Brown were met. There was a subsequent agreement of the Longs to the restrictions set forth by the Browns, and there was a slight modification of the 100 feet restriction which Mr. Brown agreed to.

From an objective standpoint, any doubt as to the formation of a contract previously would have been removed upon

2. Even if the precise moment that a contract was formed is not discernible it will not prevent the formation of a contract if there is indeed a manifestation of assent. In *Ingrassia, supra,* we stated "[o]ffer and acceptance need not be identifiable and the moment of formation need not be pinpointed." 486 A.2d at 483.

the Longs' agreement to the restrictions. It appears that possibly Mr. Brown's belief was that they were merely in negotiations, or, perhaps, that there was not a legal contract until closing or that he could change his mind up until that time. Such subjective beliefs are immaterial to the actual formation of a contract and the objective manifestations were clearly consistent with the formation of a contract to sell. As such, we feel compelled to reverse the trial court's holding that the Statute of Frauds prevented a finding of an agreement to sell real estate and the conclusion that appellants are not entitled to specific performance of the contract.

The decree of the trial court is reversed. Case remanded for appropriate actions in furtherance of specific performance of the contract. Jurisdiction relinquished.